872 So.2d 978 (2004)
James J. BENTZ and Eileen Bentz, Appellant,
v.
Carroll McDANIEL and Melvene J. McDaniel, etc., Appellee.
No. 5D03-1898.
District Court of Appeal of Florida, Fifth District.
May 7, 2004.
*979 Michael W. Youkon, Port Orange, for Appellant.
Fred A. Morrison of McLin & Burnsed, P.A., Leesburg, for Appellee.
SMITH, MAURA A., Associate Judge.
Appellants seek review of a final judgment which extinguished their easement due to the appellees' adverse possession, and granted quiet title to appellees. We conclude that there was no clear and convincing proof that appellees adversely possessed the disputed parcel of property. Likewise there was no competent evidence to establish the affirmative defense that the easement did not extend to the river. Therefore, we reverse the final judgment and remand the cause to the trial court.
Appellees Carroll and Melvene McDaniel own 100 feet of frontage on the west bank of the St. Johns River in Lake County. They purchased this real property in two transactions: the North 80 feet in 1983 which contains their home, and the South 20 feet in 1991. Appellants James and Eileen Bentz bought property across the street on July 14, 1995, with an easement across the South 20 feet of the McDaniels' property which gave them river access. This easement read in pertinent part:
A non-exclusive easement over, upon and across the north 20 feet of the south 80 feet of lot 24 ...
The Bentzes filed suit on April 30, 2001, complaining that on June 13, 2000, Mr. McDaniel sent a letter to a representative of Mr. Bentz denying the easement and refusing access. The letter claimed that while the original developer of the property dedicated a 20 foot easement platted "to the edge of what was then the water," he later dredged and created additional property between the eastern boundary of lot 24 and the river edge, but "never extended the 20 foot easement over the dredged/fill property he had created." Consequently, Mr. McDaniel concluded there was no easement.
The Bentzes asked the court to declare that they had an easement, and to define its scope. They also sought injunctive relief to remove any barriers erected by McDaniel to block the Bentzes from using the easement. The McDaniels filed an answer and affirmative defenses asserting adverse possession and abandonment, and on the basis that the claimed easement could not be recognized to give river access, since due to fill, it did not run to the river. The McDaniels also filed a counter-claim to quiet title to the claimed easement.
The trial court entered a final judgment after a non-jury trial, holding that the easement had been extinguished by adverse possession by the McDaniels. Any *980 use by the Bentzes, unknown to the McDaniels, was deemed "de minimis in nature" and insufficient to overcome adverse possession. In addition, the court found that even if the easement was still in existence, it would not reach the waters of the St. Johns River. The opinion stated:
The easement came into being in March 1972. The fill work was completed sometime prior to the creation of a 1972 U.S. Geological Survey quadrangle map dated 1972, which showed the river bank to be more or less where it stands today. The precise date of filling is uncertain on this record but it would be pure conjecture to conclude that the filling was completed before the easement came into being in March, 1972. Accordingly, the Court finds the Easterly extent of the easement, even if it remained in existence, would be the waters of the St. Johns River in their location as shown on the Hall, Farner survey, not the current river boundary. Filling is not a gradual and imperceptible process which would qualify as natural accretion. Board of Trustees of the Internal Improvement Trust Fund v. Sand Key Associates, Ltd., 512 So.2d 934 (Fla.1987). Therefore, the riparian rights which would attach to the easement [City of Daytona Beach v. Tuttle, 630 So.2d 586 (Fla. 5th DCA 1993)] would not result in the easement being extended to the new boundary of the river as the property was filled. While it may be that if the filling were conducted with appropriate permits and approvals, the easement may have been extended, the record is silent as to what permission had been granted by the State and other agencies for the filling activity, and once Defendants established the fact of the filling the burden shifted to Plaintiffs to demonstrate why, despite the filling, the easement should extend to the river as it existed after the fill was deposited on the property. Plaintiffs presented no evidence at all in this regard.
The Bentzes then appealed, raising several issues.
Initially, the Bentzes claim that the trial court committed reversible error in finding there was sufficient evidence to establish adverse possession where the trial court found that the building of a bulkhead along the river's edge was sufficient to extinguish the easement.[1]
Generally, in order to prevail on a claim that adverse possession by the servient owner extinguished an easement, the servient owner must show that he or she continuously excluded or prevented the easement's use by the dominant owner for a specified time period. See Enos v. Casey Mountain, Inc., 532 So.2d 703, 705 (Fla. 5th DCA 1988), review denied, 542 So.2d 988 (Fla.1989). The Enos court indicated that Florida case law holds that adverse possession for 7 years by the servient owner extinguishes an easement (citing to Mumaw v. Roberson, 60 So.2d 741 (Fla.1952)).
In adverse possession, the right is acquired by actual, continuous and uninterrupted use by the claimant of the lands of another for a prescribed period. In addition, the use must be adverse under claim of right and must either be with the knowledge of the owner or so open, notorious, and visible that knowledge of the use of the claimant is imputed to the owner. See Downing v. Bird, 100 So.2d 57, 63-64 (Fla.1958). The use or possession must be inconsistent with the owner's use and enjoyment *981 of his lands and must not be a permissive use, for the use must be such that the owner has a right to a legal action to stop it such as an action for trespass or ejectment. See Id. at 64. Use or possession is presumed to be in subordination to the title of the true owner, and with his permission. The burden is on the claimant to prove that the use or possession is adverse. This essential element must be proved by clear and positive proof and cannot be established by loose, uncertain testimony. In Florida there is no presumption that adverse possession, once shown to exist, continues to do so. The claimant must by clear, definite and accurate proof show that the possession continued for the full period required by law. Acquisition of rights by one in the lands of another, based on possession or use is not favored in the law and the acquisition of such rights will be restricted. Any doubts as to the creation of the right must be resolved in favor of the owner. See Id. at 64; See also Goss v. Dunbar, 834 So.2d 185 (Fla. 2d DCA 2002) (most adverse possession claims involve evidence of a fence, a substantial enclosure, or cultivation. However, plaintiff must prove this cause of action, not by the greater weight of evidence but by clear and positive proof or by clear and convincing evidence); Suwannee River Water Mgmt. Dist. v. Price, 651 So.2d 749 (Fla. 1st DCA), review denied, 660 So.2d 714 (Fla.1995) (to establish entitlement to a prescriptive easement the burden is on the claimant to prove that such use or possession is adverse to the owner).
At the non-jury trial, the fact of the recorded easement was stipulated to by the parties. The McDaniels then had the burden of proving adverse possession and/or abandonment. The Court heard testimony from Mr. McDaniel, Mr. Bentz, adjoining property owners Gary Miller and Don Morgan, and surveyors Carroll Godwin and Manhar Jadav. Mr. McDaniel testified that from the time he bought his first parcel of river front property in 1983, he knew of the 20 foot easement parcel directly to the south, owned by Flo Smith. South of her, the property along the river was owned by the Moodys. Prior to 1991, both the McDaniel parcel and the Moody parcel were "bulkheaded" with a wooden sea wall at water's edge. The easement represented a "gap" or 20 foot strip between the two sea walls. Even though he did not own it, Mr. McDaniel said he maintained this property. Neighbor Don Morgan testified that he also maintained and mowed it. Mr. McDaniel built a garage on his property that he later discovered encroached into the easement property by some 18 inches. Concerned about this he talked to his neighbor Flo Smith who owned the easement parcel. According to Mr. McDaniel, Flo Smith told him there were no remaining easements over it. So, in 1991 the McDaniels, relying on this oral information and their real estate agent, purchased the servient parcel from Flo Smith. The legal description of the property deeded by Flo Smith to the McDaniels is identical to the legal description of the easement in the Bentzes' deed. Mr. McDaniel testified at trial that this property then went to "within about a foot of the St. Johns."
Mr. McDaniel testified that in 1991 he erected a wooden bulkhead to connect his and Mr. Moody's sea walls and close the gap. McDaniel also testified that he planted a grapefruit tree and some shrubbery in the middle of the easement at the same time. Mr. McDaniel testified that his southern neighbor, Mr. Moody, used the first half of the easement as a driveway, which was the only road access to get to his property. Finally, Mr. McDaniel stated that he never saw the Bentzes walk down the easement or use it.
Mr. Bentz testified that he bought his property across the street from the *982 McDaniels in 1995, and although he visited, he did not relocate there until February of 1997. Mr. Bentz claimed he would walk across the easement parcel, to the water to check river levels and to enjoy rocket launches and wildlife. Mr. Bentz stated that it was important to him to be able to go down to the water and that he had not been prevented, up until 2000, from using the easement. He said he thought it was available when he wanted to use it even though there were several encroachments. These, he said did not interfere with his use. Thus, the unrebutted testimony was that while limited, there was use. Nothing in the testimony supported abandonment. In Estate of Johnston v. TPE Hotels, Inc., 719 So.2d 22 (Fla. 5th DCA 1998), review denied, 727 So.2d 904 (Fla.1999), this court held that abandonment requires proof by clear and convincing evidence of the intent of the owner of the dominant tenement to extinguish or abolish an easement previously acquired.
The erection of a permanent structure such as a wall is sufficient to extinguish easement rights if incompatible with an authorized right of use. See Kitzinger v. Gulf Power Co., 432 So.2d 188, 191-92 (Fla. 1st DCA 1983). McDaniel's counsel argued that the building of the seawall or bulkhead across the "gap" in 1991, prevented access to the water. Neighbors testified that at one time people used the easement parcel for small boat launches from a makeshift ramp and that such activity appears to have stopped after 1991. However, at trial Mr. McDaniel did not claim that he intended to close a boat ramp. Mr. McDaniel asserted that no boat ramp ever existed. McDaniels' counsel admitted to this court in oral argument that the seawall was constructed to keep out alligators and vermin from the river which kept coming up through the gap. Other obstructions, placed by the McDaniels in the easement were not done for the specific purpose of denying access to others. Indeed, it is clear that the McDaniels were operating under the misimpression that there was no remaining easement of record, and therefore they did not do all that might have been done to adversely possess the property. There was no evidence of any trespass sign posted, no gate was erected across the entrance to the easement, and in fact, a 17½ foot driveway opening was maintained. All structures or plantings placed in the 20 foot easement were undisputedly for the purpose of aesthetic enhancement and not as barriers.
In the instant case, the burden was at all times on the McDaniels to establish adverse possession by clear and convincing evidence. The evidence at trial was insufficient to meet this standard. The McDaniels had purchased the twenty foot wide parcel and used the property as any property owner might, but there was nothing done to the property to put the Bentzes on notice that their easement was denied or extinguished. Their actions did not prevent the Bentzes' use of the property. It is undisputed that there was no notification orally or in writing until an encounter and conversation between the parties in May, 2000. Likewise, as indicated earlier, a party claiming title to adverse possession bears a "heavy burden of proof." Downing; Kerrigan v. Thomas, 281 So.2d 410 (Fla. 1st DCA 1973). The McDaniels failed to meet this burden.
The Bentzes' other issue on appeal is whether the lower court erred in holding, in the alternative, that if the easement exists, it does not extend to the current bank of the St. Johns River.
The Bentzes argue that the trial court's holding, that the easement would only extend approximately 75 feet East of River Trace Road, is unsupported by competent substantial evidence. We agree. The McDaniels' asserted affirmative defense *983 was that Lot 24 extended on its East side to the river when it was first created and platted, but that since then the river moved east, due to filling, which likely occurred after the easement was created. Mr. Bentz and Mr. McDaniel were unable to give any personal testimony on the issue. Two neighbors, who had lived in the area since prior to 1970, both testified from personal observation that they believed the river to be in about the same location today along the McDaniel property, as it was in 1972 when the easement was created. The other two witnesses, professional surveyors, each reviewed an unrecorded survey by Hall, Farner & Associates, Inc. from 1970 (the Hall Survey) and produced a current survey of a portion of Lot 24.
Godwin, a surveyor testifying on behalf of the McDaniels, explained that the legal description of the easement to the Bentzes is identical to the legal description of the 20 foot wide parcel purchased by the McDaniels in their deed. Neither specifies an eastern boundary to the strip, except the eastern boundary of Lot 24, which was the water. There being no survey from March, 1972, Mr. Godwin looked at the Hall survey and a U.S. geological survey quadrangle map of the area from 1972[2]. The 1972 map showed current river boundaries, or a length of 240 feet from River Trace Road down the 20 foot easement parcel to the river bank. The 1970 Hall survey showed only 75 feet at the same point. The difference of 165 feet, Mr. Godwin said, if filled in (as stipulated to by the parties), was sovereign land. That is to say, it did not belong to the McDaniels or the Bentzes, but the government.
On cross examination, Godwin agreed that the original plat showed the eastern line of lot 24 being the same as the west line of the river. Godwin said he did not know when the area was filled in but guessed it was between 1970 and 1972.
The other surveyor, hired by the Bentzes, Manhar Jadav, disagreed with Godwin's conclusions. Jadav testified he made a survey in January 2003. From review of the Bentzes' deed, the easement contained therein, the title insurance documents and tax records, it was his opinion that the easement goes to the water's edge.
There was no competent evidence to support the affirmative defense that the land was filled in after the creation of the easement in March 1972 other than conjecture. All the evidence at trial supported the proposition that filling was completed by the time the quadrangle map of 1972 was published. The trial court agreed and found that the quadrangle map showed the river bank to be "more or less where it stands today." The court then, however, granted judgment on the affirmative defense, even though it had no evidence to support its central tenet that in March 1972, the river bank was not where it is today. The McDaniels, who had the burden of establishing the affirmative defense by a preponderance of the evidence[3], never testified as to what month in 1972 the quadrangle map was published nor was this map offered in evidence. Yet they asked the Court to speculate that the fill was probably placed there sometime between April and December 1972.
We note that the trial court's finding that Lot 24 does not extend to the river, but ends some 165 feet west of it, means that the McDaniels' home improvements would be on property not included in their *984 deeds. It is noteworthy that when the Bentzes' counsel attempted to ascertain the actual ownership of this 165 feet, the lower court would not allow questioning on that point. The only testimony at trial as to this issue was offered by Godwin who said the property probably belonged to the State of Florida as sovereign land. If this were true, the Bentzes argue these are public lands over which McDaniel has no right to prohibit use by the Bentzes or anyone else. In any case, we find that the McDaniels also failed to establish, by substantial competent evidence, that the easement stops short of the river.
Finally, based upon the foregoing analysis, we hold that the McDaniels should not prevail on their counter-claim quieting title. Accordingly, we reverse the Final Judgment and remand for entry of judgment in favor of the Bentzes. Upon remand the court may consider the Bentzes request for injunctive relief pursuant to this court's opinion in Sand Lake Shoppes Family Ltd. P'ship v. Sand Lake Courtyards, L.C., 816 So.2d 143 (Fla. 5th DCA 2002).
REVERSED and REMANDED.
SHARP, W., and MONACO, JJ., concur.
NOTES
[1] We do not consider whether the trial court erred in holding that once the McDaniels established adverse possession, the burden then shifted to the Bentzes to show their use was sufficient to defeat the adverse possession since we find in the first instance that the McDaniels failed to establish adverse possession.
[2] The 1972 U.S. geological survey quadrangle map was not entered into evidence.
[3] Powell v. Walbek, 209 So.2d 488 (Fla. 3d DCA), cert. denied, 219 So.2d 704 (Fla.1968); Kelly v. Threlkeld, 193 So.2d 7 (Fla. 4th DCA 1966), cert. denied, 201 So.2d 553 (Fla.1967).